# AFFIDAVIT OF SPECIAL AGENT ZACHARY MITLITSKY IN SUPPORT OF DETENTION

I, Zachary A. Mitlitsky, having been sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"). I make this affidavit in support of the government's motion to detain pending trial **JAMES LEE**.

2. I have been employed as a Special Agent since August 2020 and am currently assigned to the Office of the Special Agent in Charge (SAC), Boston, Massachusetts. I am authorized to investigate crimes involving violations of Title 8, Title 18, and Title 19 of the United States Code ("USC"). I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, where I received training to become a Special Agent; specifically, I have received certifications from the Criminal Investigator Training Program in February 2021 and from the HSI Special Agent Training Program in May 2021. I received training relating to the trafficking in persons, including sex trafficking, and other offenses.

3. I am currently assigned to the Human Smuggling and Trafficking Unit, where I investigate interstate and international human trafficking matters. I have participated in investigations of human trafficking, human smuggling, drug trafficking, financial crimes, and related offenses, which have included the executions of arrests and search warrants. Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies. I debrief defendants, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in Massachusetts, nationally, and abroad.

4.     The facts in this affidavit come from my personal observations and review of records, my training and experience and that of other investigators assisting on this case, information obtained from the review of reports, information obtained from interviews of witnesses, and other sources of information gathered through my investigation. This affidavit is intended in support of the government's motion for detention and does not set forth all of my and the other investigators' knowledge about this matter.

5.     This affidavit is designed to supplement information previously shared with the Court within my Complaint Affidavit. I believe that **JAMES** poses a risk of flight under 18 U.S.C. sec. 3142(f)(2)(A) and should be detained pending trial and in order to appear in Massachusetts. I believe this based upon, among other things, his lack of ties to Massachusetts, the strength and nature of the case, the weight of the evidence against him, the potential penalties he faces, his financial resources (both known and unknown), and his pervasive use of fraudulent identities.

## BACKGROUND OF THE INVESTIGATION AND JAMES LEE's ROLE IN THE PROSTITUTION NETWORK

6.     Beginning on a date unknown but no later than July 2020, HAN Lee ("HAN"), JAMES Lee ("JAMES"), and JUNMYUNG Lee ("JUNMYUNG"), and others known and unknown, operated an interstate prostitution network with multiple brothels in Greater Boston and Eastern Virginia. The targets advertise the prostitution network on websites under the guise of nude model photo shoots. The targets also rent high-end apartments that commercial sex workers then use to engage in sexual services for cash with customers from these websites. As detailed below, **JAMES** rented several apartments in Boston and Eastern Virginia using his real identity, as well as at least two fraudulent identities. In fact, **JAMES** is and was the sole legal tenant of at least five brothels used by this prostitution network, all of which are located in Virginia and Massachusetts. Bank and credit card records of HAN show that she paid for air travel for **JAMES**

2

to Boston and Eastern Virginia to lease these apartments. Information provided by a confidential source indicate that **JAMES** is regularly compensated by brothel owners, not just HAN, for both leasing apartments to be used as brothels, and for his travel to and from the brothel locations. Finally, financial records indicate that **JAMES** has several businesses and corresponding business bank accounts in his name and in the names of his fraudulent identities, which I believe he uses to launder the proceeds of the prostitution business.

7. The co-conspirators collectively set up the infrastructure for the brothels in multiple states to persuade, induce, and entice the women to travel to engage in prostitution. More specifically, they established and maintained websites advertising the women, the local brothel phone numbers used to communicate with customers to arrange for commercial sex for a fee, the high-end apartments where the women engaged in the commercial sex with customers and stayed overnight during their "tour" in a specific city, and the transportation to and from airports and brothel locations.

8. **JAMES** leased multiple brothel locations, that is, at least five, in Cambridge and Watertown in Massachusetts and Fairfax and Tysons in Virginia, which were used to facilitate the prostitution business. Four of them were in his **JAMES** name and two were in two different fraudulent identities. For each of these leases, **JAMES** provided identification documents, in either his identity or that of one of his fraudulent ones. He has utilized the aliases of *L.H.K.* and *J.G.W.* to rent apartment locations that were utilized for prostitution. He falsified bank statements, drivers' licenses, and paystubs in support of these efforts. He is likely to have also used the alias of *E.C.C.*, as this name appeared on a fraudulent bank statement **JAMES** submitted with an apartment rental application, but investigators have not yet identified if or how **JAMES** utilized this alias in furtherance of his criminal activities.

3

9. For many of these leases, **JAMES** flew to Massachusetts or Virginia, using his true identity, at the start of the leases. Each of these brothels were in high-end apartment buildings, with monthly rent as high as $5,600. Today, four of those active brothels were subject to search warrants executed by federal law enforcement officers. From the brothels, agents recovered among other things, condoms, cash, and women believed to be engaging in prostitution at the direction of the prostitution ring.

10. In exchange for opening the leases in his identity, or his fraudulent ones, **JAMES** received $1,000 per month for each brothel location that remained open. A review of bank records for his co-conspirator, HAN, revealed that he in fact received at least $64,000 from her, which is believed to be compensation for placing the brothel leases in his name, or in his fake identity.

11. I believe that **JAMES** in fact provides cover to the prostitution business in instances where property managers check in on and conduct inspections of the brothel locations. For example, according to an interview with the property manager, on August 31, 2023, at around 10:15 a.m., the property manager for 2985 District Ave, Unit 245 contacted **JAMES** at the listed lessee phone number of xxx-xxx-3133 related to a possible water leak in his unit and the need for the property manager to conduct an inspection. About twenty minutes later, the property manager knocked on the door of Unit 245 and an unidentified Asian female, who stated her name was "Jisoo," opened the door. The Asian female led the property manager to an area in the utility closet, where in fact a leak had occurred. After conducting an inspection and taking a video of the leak, the property manager left the unit and placed another call to **JAMES**. During that call, the property manager asked **JAMES** about who was residing in the unit, to which **JAMES** replied that it was his daughter. When the property manager asked **JAMES** his daughter's name, **JAMES** was unable to provide an answer. During that same time period in August 2023, investigators

4

viewed www.browneyesgirlsva.blog, that is, the Virginia brothel website, which advertised that "Jisoo" would be available on September 2. Therefore, I believe that the Asian female who answered the door for the property manager was the woman advertised as "Jisoo" on the Virginia Brothel website. I further believe that **JAMES** knew the female in the apartment was staying at that location for purposes of prostitution.

12. Additionally, based upon information provided to law enforcement by a cooperating source ("CS") and set forth in more detail in my Complaint Affidavit, I have reason to believe that the prostitution network tied to HAN in Virginia and Massachusetts is not the only prostitution network with whom **JAMES** has this relationship and for whom **JAMES** procures leases. I am aware that **JAMES** offered assistance to this CS to procure a lease for a brothel that the CS planned to open in Connecticut. *See* Complaint Affidavit, para 74.

## JAMES's FINANCES

13. In addition to renting apartments under these aliases, **JAMES** has also opened bank accounts under these names, incorporated businesses in California utilizing these names, and opened bank accounts under these fake businesses. Prior to **JAMES'** arrest, investigators were able to identify a number of bank accounts held by **JAMES** linked to these aliases, including accounts at Bank of America and PCB Bank, however, during the execution of a search warrant at **JAMES'** residence, agents uncovered evidence of additional bank accounts (not yet known to the government) held in the alias *L.H.K.* at Hanin Federal Credit Union, Merrick Bank, and Hanmi Bank. Agents also located financial records held in the name *Y.S.L.* with an address of 3023 Oakwood Lane, Torrance, CA, as well as business entities previously unknown to investigators.

14. Throughout the investigation, investigators have identified a number of businesses under the control of **JAMES** or one of his aliases and collected bank records on some, although

not all, of these business entities. The names of these business entities for which bank records have been reviewed including the following: Hidden Seller Inc, Orga Enterprise LLC, E.P.A. Green Services Inc, A Plus C & F Inc, and Alternative Assets LLC, each listing a signatory authority of **JAMES**; Action Holdings LLC, listing the signatory authority of *J.G.W.*; and Extra Sauce & Profit LLC, Comiso Central LLC, and Palagonia Commerce LLC, listing the signatory authority of *L.H.K.* (hereafter "the **JAMES** Business Accounts"). By reviewing the sources and uses of funds passing through the **JAMES** Business Accounts mentioned above, investigators have identified a much larger network of business entities transacting with **JAMES'** business entities that are suspected, at least some number of them, to also be under **JAMES'** control, given the very unusual and suspicious pattern of money moving between and among the accounts, as described below.

15. Traditional business entities often have recurring outgoing payments to certain vendors and recurring incoming payments from their customers, who are different from their vendors, however, the activity in the **JAMES** Business Accounts often reflect money originating from and getting paid out to many of the same business entities, as shown in the chart below:

| Money In | |
|---|---:|
| Payments from List 1 businesses | 895,418 |
| Payments from List 2 businesses | 2,307,440 |
| | $3,202,858 |
| | |
| **Money Out** | |
| Payments to List 1 buisnesses | ($1,223,019) |
| Payments to List 2 businesses | ($2,212,030) |
| | ($3,435,049) |

16.

17. In total, the number of businesses that encompass the dollar amounts reflected above include eighty-three (83) separate businesses (hereafter, the "**JAMES** Business Network"). For purposes of greater transparency, a distinction has been made by investigators regarding these

83 businesses, classifying them as "List 1" or "List 2," dependent upon the intelligence gathered on each. More specifically, there are fifteen (15) business entities that are categorized as "List 1" businesses, as these businesses include the **JAMES** Business Accounts for which bank records were analyzed, as well as six additional businesses for which financial research has indicated with a high degree of certainty to be under the control of **JAMES**. The second listing of "List 2" businesses contain sixty-eight (68) different businesses that have been the primary source, and/or the recipient, of funds passing through the **JAMES** Business Accounts. During the execution of a search warrant on **JAMES'** residence, at least three additional business entities were identified by agents that are not a part of the known **JAMES** Business Network.

18. Based on my training and experience, I believe that the volume of activity in the accounts is intentional, in part to conceal and disguise the origin, source, ownership, and control of money moving through the multiple accounts. In addition to funds derived from the **JAMES** Business Network, the JAMES Business Accounts have also received cash deposits, money orders, and covid relief payments, described below, that are likely to have been derived from **JAMES'** criminal activity, but which are masked by the extensive flow of funds in and out of the accounts from the **JAMES** Business Network. Similarly, the personal accounts held by **JAMES** and his wife, as well as a personal account held in the alias *L.H.K.*, reflect similar deposit activity, with the addition of peer-to-peer ("P2P") transactions from **JAMES'** co-conspirator in the prostitution business. When reviewing activity in both the personal bank accounts and the **JAMES** Business Accounts, deposits since January 2020 have primarily been derived from the following sources:

| | |
|---|---:|
| JAMES Business Network | $3,394,904 |
| Covid relief funds | 550,633 |
| Cash | 539,947 |

7

|  |  |
|---|---|
| P2P from Han Lee/Y.K[1] | 58,953 |
| Money orders | 41,753 |
|  | **$4,586,190** |

19.

20. As noted in the summary chart above, investigators have also identified a number of deposits from various Covid-19 related relief funds flowing into **JAMES's** personal and business accounts. Records obtained from the Small Business Administration ("SBA") regarding these relief payments provided details regarding the name, address, phone number, and IP address associated with loan submissions. Given this underlying data, for each loan submission, the SBA identified additional loan applications that were a potential match as being submitted by the same individual. For example, a loan application was submitted by **JAMES** for the business E.P.A Green Services Inc (a "List 1" business), for which a relief loan was granted and $125,000 disbursed. In connection with that application, the SBA listed additional loan applications by other business names that had been identified as potential matches, such as KAJ Intl LLC (a "List 2" business), which submitted an application from the same device and IP address associated with **JAMES's** application for E.P.A. Green Services Inc. KAJ Intl LLC is a business incorporated in California under yet a different individual's name, but which based on this information from the SBA, could likely represent another assumed identity by **JAMES**. Several of the business entities that were identified by the SBA are the same business entities that are included in the "List 2" businesses referenced above.

21. Overall, the financial activity in **JAMES'** various business accounts does not appear commensurate for the listed purposes of **JAMES's** businesses. I therefore believe that **JAMES** utilized these accounts to conceal and disguise illicit proceeds of the prostitution business,

---

[1] Y.K. is a known individual tied to Han Lee, the charged co-conspirator.

in addition to possible fraudulently obtained Covid-19 related relief funds. Given the additional business names and aliases utilized by **JAMES** that were only uncovered as a result of the search warrant executed at his residence, I believe that there are many more additional aliases, businesses, and financial accounts that law enforcement has not yet uncovered and therefore **JAMES'** true financial situation is currently unknown.

**THE SEARCH WARRANT EXECUTION & JAMES's TRAVEL HISTORY**

22. During the course of the execution of a search warrant at **JAMES's** home in Torrance, California, based on preliminary information received from agents there, I am aware that the following items were recovered:

23. From the living, from dresser drawers, agents discovered two envelopes, each containing thousands of dollars in cash. One envelope contained approximately $5,000 and the other contained approximately $10,000. Also in the dresser were ledgers, banking documents, and various other identification documents both in **JAMES**'s name and in other names, including a social security card in a known alias for **JAMES**. This known alias, however, was not one of the names used to open the brothel leases. Therefore, this is at least a *third* alias for **JAMES**. One ledger appears to document payments for bills in his name, his wife's name and in the name of one of his fraudulent identities. Also, from the dresser drawer were receipts for purchased money orders. Agents also recovered a bank book in the name of L.K with **JAMES's** address (that is, the address of the search warrant execution) along with check books in L.K.'s name.

24. Agents also recovered two cell phones believed to be used by **JAMES**.

25. From the garage, investigators found inside an additional dresser. From a dresser drawer there were financial documents, leasing agreements and various other identification documents under the known alias of L.K. used by **JAMES** to procure one of the brothel leases. In

9

the same drawer, seized multiple years of tax returns that were prepared in the name of L.K., banking documents in the name of L.K., various banking documents corresponding to businesses located at the same address in Fullerton, California associated with yet another known alias for **JAMES**.

26. In their bedroom, they also recovered tax returns in **JAMES**'s and his wife's name, prepared by the same tax preparer who did those in his fraudulent of L.K. From his bedroom they also seized another cell phone on the floor next to his bed.

### JAMES's RECENT INTERNATIONAL TRAVEL

27. As described above, a number of items were recovered from **JAMES's** home related to his identity and his fraudulent ones, not limited to banking documents, identification cards, social security cards, etc. Of note, however, agents did not locate **JAMES**'s passport.

28. In the last seven years, since 2017, **JAMES** is believed to have traveled to eight different countries on 10 separate occasions.

29. In 2023, **JAMES** traveled round trip from San Pedro California to Ensenada Mexico and back on a Cruise ship from September 25th to September 29th. In 2022, **JAMES** traveled from Los Angeles to Singapore on March 9th and returned to Los Angeles from Japan on March 18th. In 2020, **JAMES** traveled from Los Angeles to Seoul South Korea on January 3rd and returned to Los Angeles on March 5th from Seoul. In 2019, **JAMES** traveled from Los Vegas to Vancouver Canada on March 2nd. On March 21, 2019, **JAMES** crossed from Canada back into the United States. On October 1st, 2019, **JAMES** traveled from Los Angeles to Bogota, Colombia and on October 12th **JAMES** returned to Los Angeles from Bogota, Colombia.

30. In 2018, **JAMES** traveled from Los Angeles to Vancouver Canada on September 10th and returned from Vancouver Canada to Los Angeles on September 27th. On October 8th

**JAMES** traveled again from Los Angeles to Vancouver and returned from Vancouver back to Los Angeles on October 23rd. On December 28th **JAMES** traveled from Los Angeles to Seoul South Korea. On January 18th, 2019, **JAMES** returned from Seoul South Korea to Los Angeles. In 2017, **JAMES** traveled from Los Angeles to Panama City, Panama on October 3rd. On October 18th, **JAMES** traveled from Sao Paulo Brazil to Miami, Florida.

## CONCLUSION

31. For the foregoing reasons and those to be offered at the detention hearing, I believe there is a preponderance of the evidence to believe that **JAMES** is a risk of flight. I further believe that **JAMES** will not appear in the District of Massachusetts for his case. I also believe that **JAMES** should be detained pending trial.

Respectfully submitted,

_____
Zachary Mitlitsky
Special Agent
Homeland Security Investigations